# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | ) CRIMINAL NO. 18-63 |
| v. | ) |
| **DEREK REDDIX,** | ) |
| Defendant. | ) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

CONTI, Senior District Judge.

I.  Introduction

Defendant Derek Reddix ("Reddix") filed a motion (ECF No. 51) seeking to: (1) suppress evidence obtained from a contact with law enforcement officers on February 23, 2018; (2) suppress his statements that he dropped a cell phone during his flight; and (3) obtain a "Franks hearing" regarding a subsequent affidavit in support of a search warrant for two cell phones. The government filed an omnibus response in opposition to the motion (ECF No. 53). On June 19, 2019, the court held an evidentiary hearing. (Transcript, ECF No. 55). The parties were permitted to file simultaneous proposed findings of fact and conclusions of law. After several requests for extensions of time by counsel for Reddix, the parties filed their post-hearing submissions on October 11, 2018. (ECF Nos. 64, 65). The government filed its response in opposition to the request for a Franks hearing on November 8, 2019. The motion is ripe for disposition.

II.  Factual and Procedural Background

Reddix is charged in a one-count indictment at Criminal Number 18-63 with possession of a firearm by a convicted felon on February 23, 2018, in violation of 18 U.S.C. § 922(g)(1).

Reddix contends that the initial warrantless stop on February 23, 2018 was without reasonable suspicion or probable cause because officers could not have seen a gun from where they were located and he was "seized" when he stopped at the officers' command, before running away. Reddix contends that the gun and cell phones recovered after he fled, any statements made by him, and the subsequent search warrant for the contents of the cell phones should be suppressed as fruits of the illegal seizure.

Findings of Fact

1. Pittsburgh Police Lieutenant Arthur Baker ("Lt. Baker") and Detective (now Sergeant) Harrison Maddox ("Det. Maddox") testified at the hearing. Lt. Baker and Det. Maddox offered credible testimony.

2. The defense called investigator Kevin Parente ("Parente") as a witness. Parente offered credible testimony.

3. On February 23, 2018, Lt. Baker, Sergeant Andrew Baker ("Sgt. Baker") and Det. Maddox were patrolling the Homewood neighborhood of Pittsburgh, Pennsylvania, in a marked police car as part of a violent crime response effort in Zone 5 prompted by 26 shootings in the prior four months. Tr. 15, 17.

4. The targeted enforcement effort sought to identify the individuals believed to be causing the violence. As part of the violence prevention initiative, Det. Maddox prepared an intel packet containing the photographs and criminal histories of those individuals. Tr. at 81; Govt. Ex. 10.

5. Det. Maddox included Reddix in the intel packet because homicide detectives identified Reddix as a possible witness or actor in a homicide in October 2017. Tr. at 26, 82. Reddix's

criminal history showed that he was on release for two pending state gun charges. Tr. at 81-82.

6. Lt. Baker explained that prior to doing a violent crime response operation, the officers have a daily briefing at which they go over pictures, locations and a plan of action. Tr. 27.

7. On February 23, 2018, the officers were not specifically looking for Reddix. Tr. 74.

8. At approximately 4:25 p.m. on February 23, 2018, Lt. Baker, Sgt. Baker and Det. Maddox were in a marked police car driving on the 7500 block of Formosa Way in Homewood. Lt. Baker was driving; Sgt. Baker was in the front passenger seat; and Det. Maddox was in the back seat behind the driver. Tr. 78.

9. Lt. Baker and Sgt. Baker were in full uniform. Det. Maddox was wearing khakis and a shirt and displayed a police badge around his neck. Tr. 62.

10. The weather was cloudy, but visibility was clear. Tr. 22, 62. It had rained earlier that day, but it was not raining at the time of the incident. Tr. 54.

11. As he drove on Formosa Way, Lt. Kelly looked between buildings and observed an individual in a courtyard area, at the rear of houses whose fronts were on a parallel road, 7586 and 7588 Kelly Street. Tr. 23.

12. The house at 7588 Kelly Street was longer and extended further into the rear courtyard area than the house at 7586 Kelly Street. The individual was not in the narrow alley between the houses. Instead, he was in the rear courtyard area behind 7586 Kelly Street and beside 7588 Kelly Street. Tr. 31.

13. Lt. Baker estimated that the distance from him to the individual was 60 feet. Det. Maddox, who also saw the individual, estimated the distance at approximately 50 or 60 feet. Parente paced the distance and estimated it at 70 feet. Parente later measured the distance from

Formosa Way to the back of the house at 7586 Kelly Street at 100 feet. Tr. 48, 83, 113, 137-39, 142.

14. The court finds that the variations between the distances estimated by the officers and the distance measured by Parente does not lessen the credibility of the officers' testimony. Even if Reddix was 100 feet away, the officers could have made the observations about Reddix's behavior to which they testified.

15. Lt. Baker observed the individual manipulating an object in his waistband with his hand. Lt. Baker could not see the object, but based on his training and experience he believed it was a firearm. He pulled the car to the curb. Tr. 23-24. Det. Maddox did not see a firearm, but also believed the individual was adjusting a firearm in front of his waist. Tr. 132.

16. According to Lt. Baker, the individual looked up and saw the police car, froze and gave a panic-stricken look. While he referred to a panic-stricken look, which he would not likely have seen at that distance, Lt. Baker clarified that the individual stopped what he was doing and looked at him. Tr. 24.

17. Lt. Baker explained that based upon his experience, he was "pretty sure" the individual had a firearm based on his actions and reaction to the police presence. The individual manipulated an object in his waistband, looked over and saw the police, stopped moving and totally froze, and stared at them. Tr. 57-58. Lt. Baker testified that his suspicion was not based on the individual's facial expression. Tr. 59.

18. According to Det. Maddox, when the individual made eye contact with Lt. Baker, he totally changed his body posture and behavior. Tr. 102.

19. Lt. Baker told the other officers: "get out of the car; the guy's got a gun; he's going to run." Tr. 24-25.

20. At the time, Lt. Baker did not know who the individual was. Tr. 25. No other people were in sight. Tr. 64.

21. Det. Maddox observed the individual and immediately thought it might be Reddix, on whom he had done a workup. The facial characteristics were similar, but his appearance was drastically changed because Reddix used to have very long dreadlocks. Tr. 80. The individual's facial hair differed as well. Tr. 105. Det. Maddox was not 100% certain, but knew the individual looked similar to Reddix. Tr. 106. Once Det. Maddox saw him, he thought it was Reddix. Tr. 132.

22. Sgt. Baker and Det. Maddox quickly got out of the car. Both were armed. Tr. 62. The individual took a step to the left, took another step, and began running through the courtyard. Tr. 29.

23. After the individual began running, Det. Maddox yelled "police, stop!" Tr. 84.

24. The individual did not comply with the command or stop, even for a moment. Tr. 85.

25. Sgt. Baker and Det. Maddox gave chase on foot. Lt. Baker drove around the corner to cut him off.

26. The individual cut through a narrow alley between the houses at 7578 and 7580 Kelly Street. Tr. 86.

27. Det. Maddox drew his gun at that point because he was concerned about a possible ambush. Tr. 121.

28. When Lt. Baker turned onto Kelly Street, he saw the individual run down Kelly Street with the officers in pursuit and cut back into the courtyard area. Tr. 35, 89.

29. Lt. Baker continued to circle the block onto Formosa Way again. The individual was running toward the police car, but stopped and turned back. Tr. 35.

30. At that point, Sgt. Baker tackled the individual. Tr. 37.

31. Det. Maddox caught up and the officers pulled the individual's arms from underneath and handcuffed him. Reddix became compliant and the officers took him into custody. Tr. 37, 90, 92. At that point, Reddix provided basic biographical information, including his name. Tr. 25, 127.

32. The entire incident took less than a minute. Tr. 70.

33. Lt. Baker called the mobile crime unit because he thought a firearm would be found and he wanted to process the evidence. Tr. 38.

34. Reddix was searched, but did not have a firearm on his person. The officers recovered over $2,000 in cash from his pockets. Reddix had a blue Alcatel flip phone in his hand. Tr. 90-91.

35. Reddix told Det. Maddox that he dropped a silver cell phone during the chase and asked if the officers found it. Tr. 92. These statements were initiated voluntarily by Reddix; they were not made in response to questioning from the officers. Tr. 93.

36. Sgt. Baker left to search the flight path for a firearm. Tr. 39.

37. Sgt. Baker found a firearm under the rear porch of 7578 Kelly Street. Tr. 41, 44; Govt. Ex. 8, 9. This home was next to the alley that Reddix used to cut from the courtyard to Kelly Street during his flight. Tr. 88, Govt. Ex. 7.

38. A silver LG phone was located three to five feet away from the firearm. Tr. 72, 94.

39. The mobile crime unit arrived and took photos of the firearm. Govt. Ex. 8, 9. They did not take photos of the cell phone. Tr. 72.

40. Det. Maddox prepared the police report of the incident. Tr. 97, Def. Ex. A.

41. As set forth in the police report, the blue cell phone and silver cell phone were turned over to detectives for further investigation. Def. Ex. A.

42. On April 13, 2018, Joseph Bielevicz ("Bielevicz"), a Pittsburgh police officer assigned to an ATF taskforce, prepared an application and affidavit to obtain a search warrant for the cell phones, which were held in police custody. (ECF No. 51-2).

43. Essentially, Bielevicz averred there was probable cause to believe that Reddix was the user/possessor of the silver cell phone because it was found in close proximity to the firearm, and a search of the silver cell phone would establish that it belonged to Reddix. *Id.* ¶ 10. The application also averred it was probable that both cell phones contained evidence (such as photos or texts) that Reddix unlawfully acquired or possessed the firearm. *Id.* ¶¶ 11-13.

44. The search warrant was issued by a federal magistrate judge. *Id.*

45. In ¶ 4 of Bielevicz's affidavit, he stated that it was based on a number of sources, including Det. Maddox's police report. *Id.*

46. In particular, the affidavit contains the following statements, which Reddix argues warrant a *Franks* hearing: (1) the officers were on patrol "when they saw Derek REDDIX, a person known to them from previous interactions"; (2) "the detectives knew REDDIX to be a convicted felon who is prohibited from possessing firearms"; (3) the detectives "saw REDDIX manipulating what appeared to be a firearm in his waistband"; and (4) "REDDIX made eye contact with the detectives and appeared surprised or alarmed."[1] *Id.*

---

1. In his motion, Reddix also argued that officers omitted from the affidavit their initial observation that Reddix was merely talking on his cell phone. Reddix did not pursue this argument in his post-hearing memorandum.

**Conclusions of Law**

1. The Fourth Amendment protects the public from "unreasonable searches and seizures." U.S. Const. amend. IV.

2. Reddix argues that the initial arrest was not supported by reasonable suspicion or probable cause and that all subsequent searches are the fruit of the poisonous tree. Reddix also contends that he is entitled to a *Franks* hearing because the affidavit in support of the cell phone search warrant contains material misstatements.

3. The government must prove, by a preponderance of the evidence, that "each individual act constituting a search or seizure under the Fourth Amendment was reasonable." *United States v. Ritter*, 416 F.3d 256, 261 (3d Cir. 2005).

### A. The Initial Encounter

4. Consensual encounters, i.e., when an officer approaches a person on the street or in a public place, and a reasonable person would feel free to decline the officers' request or otherwise terminate the encounter, implicate no Fourth Amendment interest. *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018) (citing *Florida v. Bostick*, 501 U.S. 429, 430, 434 (1991)). In this case, the officers could stop the police car, exit it, and approach Reddix on February 23, 2018, without violating his Fourth Amendment rights.

5. The government has the initial burden to prove that a *Terry* stop[2] is based on reasonable suspicion. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Reasonable suspicion is an "elusive concept," but it unequivocally demands that "the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal

---

[2] Under *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny, officers may conduct a brief investigatory stop when they have reasonable, articulable, and individualized suspicion that criminal activity is afoot and may conduct a pat down search to determine whether the person is carrying a weapon.

activity." *United States v. Cortez*, 449 U.S. 411, 417–18 (1981). In this case, the officers had reasonable suspicion to stop and frisk Reddix because there were objective, particularized facts to support a reasonable suspicion to believe that he was unlawfully possessing a firearm in his waistband.

6. Reddix's reaction to seeing the officers, and his subsequent flight, gave the officers reasonable suspicion to pursue him. *United States v. Valentine*, 232 F.3d 350, 356 (3d Cir. 2000) (in *Wardlow*, the Supreme Court held that "headlong flight from the police in a high-crime area provides reasonable suspicion, despite the fact that flight is not by itself illegal and could have completely lawful and rational explanations.").

7. Reddix contends that he was seized, without probable cause, when the officers got out of the police car and ordered him to stop. He points to the statement in Det. Maddox's report which provides: "it was clear that [Reddix] was not free to run away from us." Def. Ex. A.

8. Reddix is correct that a seizure may occur if a suspect submits to an officer's show of authority, even if he subsequently flees. *United States v. Brown*, 448 F.3d 239 (3d Cir. 2006) (seizure occurred where defendant yielded to authority by moving to place his hands on police car before running).

9. Not all encounters with the police result in a seizure, however. In *Brown*, the court explained that a suspect must yield to the officers' assertion of authority with more than momentary compliance:

> The facts before us are similar to those of *United States v. Coggins*, where a police officer began questioning the defendant and his companions, the defendant stood up and asked to go to the bathroom, the officer told him to wait, the defendant sat back down, then again stood and ran off. 986 F.2d at 652–53. We held that the defendant "initially yielded to [the officer's] authority by sitting back down," and there was thus a seizure "[e]ven though he fled soon thereafter." *Id*. at 654. Unlike the defendant in *United States v. Valentine*, Brown demonstrated more than "momentary 'compliance' " with the arresting officers' demands. 232 F.3d 350, 359

9

(3d Cir. 2000) ("Even if Valentine paused for a few moments and gave his name, he did not submit in any realistic sense to the officers' show of authority.").

*Id*. at 246.

10. In *Hester*, the court explained that a restraint on liberty marks the line between a seizure and a consensual encounter, but does not end the analysis; courts must also consider whether the suspect submitted to a show of authority. 910 F.3d at 86-87.

11. The court in *Hester* recognized that suspects had not manifested sufficient submission to authority by: (1) taking two steps towards the car in a feint, and subsequently dashing off, as in *United States v. Smith*, 575 F.3d 308, 315-16 (3d Cir. 2009); or (2) responding "Who me?" to an officer's request that he stop, before immediately running away, as in *Valentine*, 232 F.3d at 359. *Hester*, 910 F.3d at 86-87.

12. In this case, Reddix never submitted to the officers' commands to stop, not even for a moment. Finding of Fact ¶ 24. Reddix was not seized until after he fled and was tackled.

13. In *United States v. Acosta*, 751 F. App'x 201 (3d Cir. 2018), the court held that no Fourth Amendment violation occurred on very similar facts involving a suspect who fled upon seeing the police and abandoned a gun while being chased.

14. Pursuant to *Acosta*, the firearm recovered in this case would be admissible in evidence for the alternative reason that it was abandoned and recovered in a later search rather than as a result of any seizure of Reddix. *Acosta*, 751 F. App'x at 202-03.[3]

---

[3] Other than contending that the firearm was the poisonous fruit of a prior illegal seizure, Reddix did not establish that he has standing to challenge the admissibility of the firearm. *See United States v. Giles*, No. CR 14-281, 2016 WL 47881, at *7 (W.D. Pa. Jan. 4, 2016) (defendant has no standing to challenge the recovery of the abandoned firearm).

15. In summary, the pursuit and seizure of Reddix were lawful and there is no basis to suppress the evidence obtained by officers or statements made by Reddix on February 23, 2018.

### B. *Franks* Hearing

16. Reddix seeks a "*Franks* hearing" regarding the affidavit for the cell phone search warrant.

17. To trigger the right to a *Franks* hearing, a defendant must make a "substantial preliminary showing" that: (1) a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit; and (2) the allegedly false statement is necessary to the finding of probable cause. *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). The Supreme Court explained:

    > To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained. Allegations of negligence or innocent mistake are insufficient.

    *Id*. at 171.

18. Reddix failed to meet either prong of this test.

19. As explained in *United States v. Brown*, 631 F.3d 638 (3d Cir. 2011), "[a]n assertion is made with reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'" *Id*. at 645 (quoting *Wilson v. Russo*, 212 F.3d 781, 788 (3d Cir.2000)). The court identified two distinct ways in which conduct can be found reckless: "either the affiant actually entertained serious doubts; or obvious reasons existed for him to

do so, such that the finder of fact can infer a subjectively reckless state of mind." *Id*.

20. The court first addresses the falsity prong.

21. The statement in the affidavit that officers believed Reddix was manipulating "what **appeared** to be a firearm" (emphasis added) was prepared by Bielewicz and was consistent with the officers' testimony at the hearing. There are no statements in the affidavit that the officers actually saw a firearm.

22. The statement in the affidavit that "the detectives knew REDDIX to be a convicted felon who is prohibited from possessing firearms" was also consistent with the officers' hearing testimony. Lt. Baker and Det. Maddox knew, prior to February 23, 2018, that Reddix was a person of interest in the Zone 5 Violence Suppression initiative and were aware of his criminal history.

23. The statement in the affidavit that "REDDIX made eye contact with the detectives and appeared surprised or alarmed" was consistent with the officers' credible testimony. The defense argues that the officers were too far away to observe his facial expressions. In the affidavit, however, there are no statements that the officers' conclusions were based on facial expressions. Lt. Baker testified that his suspicion was not based on Reddix's facial expression. Tr. 59. It is clear from the testimony that Reddix stared at the officers, and his body posture froze and changed in a suspicious manner when he saw the police car, which prompted Lt. Baker to tell the other officers that he had a gun and was going to run. Tr. 57-58.

24. The statement in the affidavit that the officers were on patrol "when they saw Derek REDDIX, a person known to them from previous interactions" was accurate, but was somewhat misleading. Reddix's identity as the individual involved in the incident was

confirmed when he was taken into custody after the short chase and is not disputed. The affidavit, however, overstated the strength of the officers' initial identification. Lt. Baker did not immediately recognize the individual and Det. Maddox thought the individual looked similar to Reddix, albeit without dreadlocks, but was not 100% certain. The phrasing of the affidavit, however, was not a misstatement made with reckless disregard for the truth. Bielevicz, who was not involved in the original arrest, was restating information from Det. Maddox's report, which made numerous references to "Reddix" as the actor throughout the encounter. There is no basis to believe that Bielevicz must have entertained serious doubts as to the truth of this statement or had obvious reasons to doubt the accuracy of the information he reported in his affidavit. Attempts to manufacture ambiguity in hindsight are inappropriate. Affidavits "are normally drafted by nonlawyers in the midst and haste of criminal investigation," and must be construed in a common-sense fashion. *United States v. Ventresca*, 380 U.S. 102, 108 (1965).

25. As to the "necessity" prong, the court must consider whether the affidavit's remaining content is sufficient to establish probable cause, if the allegedly false material is set aside. *Franks*, 438 U.S. at 156. As explained above, the only fact in the affidavit which could be misleading involves the initial identification of the individual in the courtyard. If that sentence were stricken, or modified to reflect that the individual was later determined to be Reddix when he was arrested, the affidavit would still support probable cause to search the cell phones. The person's identity was not essential to the officers' initial reasonable suspicion to investigate a person appearing to manipulate a firearm in his waistband or to pursue that individual when he took flight. Upon being taken into custody, Reddix's identity was confirmed and he told officers that he lost a silver cell phone. A firearm was recovered

13

along the flight path and a silver cell phone was found within a few feet of the firearm. No other people were in sight. Those facts support a common sense basis to search the cell phone. At the time Bielevicz applied for the search warrant, officers knew the individual who fled was Reddix, that Reddix was prohibited from possessing a firearm, that Reddix admitted he lost a silver cell phone, and that the cell phone and firearm were found in close proximity. There was probable cause to believe that Reddix possessed both the silver cell phone and the firearm and discarded both items during his flight. The affidavit, even striking the averment regarding the initial identification of Reddix in the rear courtyard, provided probable cause to search the cell phone.

26. In summary, Reddix is not entitled to a *Franks* hearing.

### III. Conclusion

After careful consideration of the record and relevant legal authorities, the court concludes that the motion to suppress evidence filed by Reddix (ECF No. 51) will be DENIED.

An appropriate order will be entered.

November 21, 2019

BY THE COURT:

/s/ *Joy Flowers Conti*
Joy Flowers Conti
Senior United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA, | ) | CRIMINAL NO. 18-63 |
|---|---|---|
| v. | ) | |
| **DEREK REDDIX,** | ) | |
| Defendant. | ) | |

## **ORDER**

AND NOW, this 21st day of November, 2019, for the reasons set forth in the accompanying Findings of Fact and Conclusions of Law, IT IS HEREBY ORDERED that the motion to suppress evidence filed by Reddix (ECF No. 51) is **DENIED**.

A telephone status conference is scheduled for November 26, 2019 at 2:00 p.m., to set a trial date as the Speedy Trial clock is now running.

BY THE COURT:

/s/ Joy Flowers Conti
Joy Flowers Conti
Senior United States District Judge